*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 7, 2024

Plaintiff-Appellee,

v

No. 362520
Allegan Circuit Court
LC No. 2019-022614-FC

MATTHEW JOHN HOLTMAN,

Defendant-Appellant.

Before:  HOOD, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Defendant, Matthew John Holtman, appeals by right his jury trial conviction of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) and (2)(b) (penetrative sex acts by a person 17 years of age or older against an individual less than 13 years old).[1]  The trial court sentenced Holtman as a second-offense habitual offender, MCL 769.10, to serve 39 to 60 years' imprisonment for each CSC-I conviction to be served concurrently.  On appeal, Holtman argues that the trial court erroneously admitted other-acts evidence, including evidence of sexual misconduct that occurred when he was six years old, and hearsay evidence.  He argues that these errors entitle him to a new trial.  We agree and vacate his convictions and remand for a new trial.

## I. BACKGROUND

This case arises out of Holtman sexually assaulting a minor, M, between January 2016 and March 2019, when he was between 30 and 33 years old, and M was between five and eight years old.  In February 2019, M and her mother J lived in the home of J's mother in Otsego, Michigan with J's other two children and her mother.  At the time, Holtman and J were engaged and Holtman was the father of all of J's children except for M.  Holtman was in a relationship with J for several years and would stay occasionally with them at her mother's house.  Holtman would help her care

---

[1] Holtman also pleaded guilty to one count of absconding or forfeiting bond, MCL 750.199a, in a separate case, Allegan Circuit Court Case No. 21-24944-FH.  Holtman does not challenge this count of conviction on appeal.

for the children and she would leave the children alone with him for hours at a time. M testified that Holtman began sexually abusing her when she was five or six years old. The abuse took place repeatedly for three years at different locations, including a bedroom in Holtman's home in Kalamazoo, the living room of a trailer in Kalamazoo, and in the basement of J's mother's home.

Two incidents form the basis for the CSC-I charges: a penile-genital penetration at the Otsego residence (Count 1), and a penile-oral penetration at Holtman's Kalamazoo house (Count 2). On one occasion at the Otsego home, Holtman told M to go to the basement to help him with laundry when her mother was sleeping. After they finished folding clothes, Holtman ordered her to take off her clothes and, once they were both undressed, penetrated her genitals with his penis while she knelt on a chair. On another occasion, in a bedroom at Holtman's house in Kalamazoo, Holtman assaulted M in her bunk bed by having her perform oral sex on him.

M, who was 11 at the time to of trial, testified about these assaults and others. She described the sexual assaults as occurring on multiple occasions. Relevant to this appeal, although M provided detailed testimony about the context of the sexual assaults, her language regarding the penetration that formed the basis of Count 1 was imprecise. Initially, she described Holtman as trying to touch her "private part." She later clarified that it was her "back private part," and later clarified further that it was the part she used to "poop." She used euphemistic language to describe anatomy and her description of the act of penetration (particularly the penetration forming the basis for Count 1) was imprecise. Even her clearest description was imprecise:

> *Q.* Okay. And then he would try and put it – he would put it in between his cheeks [sic] on the back side.
>
> *A.* He would try to.
>
> *Q.* He would try to, okay. So there's the cheeks and then there's the hole. So, did it go—
>
> *A.* He was trying to put it in the hole but it never worked except for one time when we were at his house.
>
> *Q.* Okay. So it would be in between the cheeks and he would try and go in the hole but it didn't go in the hole.
>
> *A.* Yes.

Holtman does not directly challenge the sufficiency of this testimony. These facts are nonetheless relevant as it relates to his hearsay challenge.

M first reported the abuse in February 2019, when she was eight years old. Her second-grade teacher showed an age-appropriate "body safety" video to her class, and M began to cry. When her teacher came to comfort her, M told her about the abuse, and later told the school counselor and a health teacher. After returning home that day, she told J. M testified that she had not told her mother about the abuse beforehand because Holtman had told her not to, stating that he would "go to somewhere for a really really long time." J testified that, when confronted,

Holtman denied the sexual-abuse allegations. M later testified that the sexual assaults stopped after she reported them.

Two months after M first reported the sexual assault to her teachers, Dr. Debra Simms, a doctor at the Helen DeVos Center for Child Protection, examined her. Although the Safe Harbor Children's Advocacy Center (Safe Harbor), the entity responsible for M's forensic interview, referred M to Dr. Simms, M's mother made the appointment and took her to the exam. The prosecution was not otherwise involved in the medical exam. Prior to the exam, M's mother told her she would have to explain what happened.

At trial, the prosecution offered Dr. Simms's testimony, and the trial court qualified her as an expert witness in sex abuse. Dr. Simms took M's medical history, during which M described the sexual assaults. She then conducted a physical exam, which revealed no physical indications of sexual trauma. The exam, however, revealed a tooth abscess, for which Dr. Simms referred M to a dentist, and a skin tag, for which Dr. Simms referred M to a primary care doctor.[2] She testified about the names that M used to refer to her anatomical parts "because we [the medical center] needed to know what she calls those parts because we refer to them by the same name." She testified that when she asked M why she was there "for a check-up," M stated, "My dad pulled my pants down and put his gina in my gina." Dr. Simms explained that M defined her dad as Holtman and translated M's euphemisms for anatomy, including referring to female genitalia as "gina" or "agina." She also testified to M's statements detailing Holtman's sexual abuse, how it made M feel, and how often the abuse occurred "because our testing can be related to how far back the exposure was." She acknowledged that she found no physical evidence of sexual trauma.

Defense counsel objected to the admission of this testimony during trial, arguing that it was inadmissible hearsay. The trial court overruled the objection, stating that MRE 803(4)[3] allows for statements made for purposes of medical treatment and diagnosis, and that "a sufficient foundation has been laid by the doctor's testimony that these statements were made for the purpose of a medical treatment."

In addition to M and Dr. Simms, Holtman's cousin, AD, testified. Prior to trial, AD wrote a statement that Holtman sexually assaulted her when they were children. At trial, AD testified about four separate incidents of Holtman sexually assaulting her, from when AD was "about 2 years old" and Holtman was 6 or 7 years old, to when AD was "either 9 or 10, I'll say 10" and

---

[2] During her direct examination, Dr. Simms stated that the redness or skin tag near the genitals was common in young girl particularly in cases of poor hygiene, "bubble baths," or irritation during summer months. On redirect, the trial court allowed Dr. Simms to testify that an adult male rubbing his genitals on the area *could* have caused the skin tag. The defense objected to the prosecution's leading question that elicited this testimony on the basis that it was speculation. The trial court overruled the objection on the basis that Dr. Simms was already qualified as an expert. The trial court did not address the defense's contention that the testimony about possible causes was nonetheless speculation. Notably, earlier in Dr. Simms's testimony, she explained that the skin tag could be the result of poor hygiene.

[3] The Michigan Rules of Evidence were recently amended, effective January 1, 2024.

Holtman was "roughly 14, maybe 15." During cross-examination, AD acknowledged that she only came forward about these assaults after she heard about the accusations in this case. Despite some of the events occurring when she was two years old, AD also testified that she was "positive" about the accuracy of her memories.

The trial court ruled on the admissibility of AD's testimony before trial. Prior to trial, the prosecution provided notice of its intent to introduce evidence of other acts pursuant to MCL 768.27a, and filed a motion for its admission. At the hearing on the motion, defense counsel objected to the evidence on MRE 403 grounds. The defense noted that there was no conviction, only allegations; and that there was no corroborating evidence. Defense counsel argued that "at the risk of confusing the jury, we would ask the Court to not allow this due to its prejudicial nature." Noting the liberality of MCL 768.27a as compared to MRE 404(b), the trial court ruled that the evidence was admissible without explicitly considering or weighing the factors identified in *People v Watkins*, 491 Mich 450, 487-488; 818 NW2d 296 (2012). During trial, the defense again objected to the relevance and admissibility of AD's testimony. The trial court overruled the objection for the same reasons as previously held in the motion hearing: the probative value of the evidence outweighed the prejudice and the testimony was admissible under MCL 768.27a.

The jury found Holtman guilty on both counts of CSC-I. During his sentencing hearing, the trial court sentenced Holtman at the top end of the guidelines for both the CSC-I convictions to 39 to 60 years' imprisonment, to be served concurrently. This appeal followed.

## II. STANDARD OF REVIEW

A trial court's decision to admit evidence is reviewed for an abuse of discretion. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). "A trial court abuses its discretion when its decision falls outside the range of principled outcomes." *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010) (quotation marks and citation omitted). A trial court may abuse its discretion when its decision arises from an "incorrect legal framework," *People v Hine*, 467 Mich 242, 251; 650 NW2d 659 (2002), or when the evidence admitted is "inadmissible as a matter of law," *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010) (quotation marks and citation omitted). We review de novo whether the trial court properly applied the law or whether a rule of evidence or statute precludes admission. *Id*.

## III. OTHER-ACTS EVIDENCE UNDER MCL 768.27A

Holtman first argues that the trial court erred by admitting statutory other-acts evidence because the risk of unfair prejudice substantially outweighed the evidence's probative value under MRE 403 pursuant to the factors listed in *Watkins*, 491 Mich at 487-488. We agree. The trial court should have excluded testimony about the unrelated sexual assaults that AD claimed Holtman committed between ages 5 and 15, some of which occurred when AD was two years old.

Other-acts evidence of sexual acts with AD while she was a minor are covered by MCL 768.27a(1), which states:

> Notwithstanding [MCL 768.27], in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may

be considered for its bearing on any matter to which it is relevant. If the prosecuting attorney intends to offer evidence under this section, the prosecuting attorney shall disclose the evidence to the defendant at least 15 days before the scheduled date of trial or at a later time as allowed by the court for good cause shown, including the statements of witnesses or a summary of the substance of any testimony that is expected to be offered.

MCL 768.27a(1) is a statutory carveout to the Michigan Rules of Evidence. Like MRE 404(b), it permits the prosecution to introduce evidence of a defendant's other bad acts. See MCL 768.27a(1). However, while MRE 404(b) only permits other-acts evidence for nonpropensity purposes, MCL 768.27a(1) allows the admission of other instances of sexual misconduct for any relevant purpose. This is because, as our Supreme Court has noted, "the reasons for enacting MCL 768.27a were . . . to address a substantive concern about the protection of children and the prosecution of persons who perpetrate certain enumerated crimes against children and are more likely than others to reoffend." *Watkins*, 491 Mich at 476. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "A trial court admits relevant evidence to provide the trier of fact with as much useful information as possible." *People v Cameron*, 291 Mich App 599, 612; 806 NW2d 371 (2011). Our Supreme Court has observed that a defendant's propensity to commit a crime makes it more probable that he committed the charged offense. *Watkins*, 491 Mich at 470.

The admission of evidence under MCL 768.27a is still subject to the requirements of MRE 403, *Watkins*, 491 Mich at 486, which permits the exclusion of evidence if the probative value of the evidence is substantially outweighed by its risks of unfair prejudice, confusion of the issue, misleading the jury, undue delay, waste of time, or needlessly cumulative evidence, see MRE 403. See also *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008) ("Unfair prejudice" exists when "there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence."). However, the balancing test for MRE 403 when addressing evidence under MCL 768.27a usually requires courts to "weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect." *Watkins*, 491 Mich at 487. "[O]ther-acts evidence admissible under MCL 768.27a may not be excluded under MRE 403 as overly prejudicial merely because it allows a jury to draw a propensity inference." *Watkins*, 491 Mich at 487.

This does not mean, however, that other-acts evidence admissible under MCL 768.27a may never be excluded under MRE 403 as overly prejudicial. There are several considerations that may lead a court to exclude such evidence. These considerations include (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. This list of considerations is meant to be illustrative rather than exhaustive. [*Id*. (citations omitted).]

When weighing the probative value of other-acts evidence, courts should consider the extent to which the other-acts evidence supports the victim's credibility and rebuts any defense attack on the victim's credibility. *Id*. at 491-492.

The trial court stated that the prosecutor did not have to justify the admissibility of the evidence under MRE 404(b), see *People v Pattison*, 276 Mich App 613, 618-619; 741 NW2d 558 (2007), and that "any prejudice to the defendant is outweighed by the probative value and especially due to the details provided by the prosecutor" about AD's history of contact with Holtman. The court then granted the prosecution's motion. The trial court's failure to consider the *Watkins* factors (or other relevant factors) before granting the motion was an abuse of discretion. See *Hine*, 467 Mich at 251. This error is amplified by the low probative value and high risk of unfair prejudice related to the other-acts evidence at issue here, which included conduct that occurred when Holtman was six or seven years old and unable to form criminal culpability.

The list of factors in *Watkins* is "illustrative rather than exhaustive," *Watkins*, 491 Mich at 487, so we begin with a factor not explicitly identified in *Watkins*, but requiring our consideration: the other-acts evidence was testimony about conduct that occurred when Holtman was a minor, including acts when he was six or seven years old and too young to be held criminally or civilly liable. See *Tyler v Weed*, 285 Mich 460, 469-470; 280 NW 827 (1938) (restating the common-law rule historically known as criminal infancy exempting children under seven years of age from criminal responsibility). See also *Newton v Progressive Marathon Ins Co*, ___ Mich App ___, ___; ___ NW2d ___ (2024) (Docket No. 364569); slip op at 6-7 (civil liability for minors); MCL 712A.4 (providing waiver procedures for juveniles 14 years of age or older); MCL 600.606(1) (raising the age of criminal majority from 17 to 18 years old).[4] Here, Holtman's age during the other-acts (i.e., 6 years old, 7 years old, and "roughly 14, maybe 15") distinguishes the acts from the charged conduct, both diminishing their probative value and exponentially increasing the risk of unfair prejudice. The conduct of a 6-year-old, 7-year-old, or 14- or 15-year-old means something very different than the conduct of a 33-year-old, or even that of an 18-year-old. This is

---

[4] In *People v Cowhy*, 330 Mich App 452; 948 NW2d 632 (2019), this Court reversed the trial court's decision to exclude an affidavit a defendant submitted in earlier proceedings in support of a motion to withdraw his guilty plea. In the affidavit, the defendant admitted to sexually assaulting five of his relatives while he was a juvenile. *Id*. at 458-460. This Court upheld the admission of the document under MRE 410 (prohibiting the use of statements made in plea negotiations except under certain circumstances) and MRE 402 (relevance). *Id*. at 461-472. This Court noted in a footnote that even if the affidavit only related to crimes committed as a juvenile, "such evidence would be admissible under MCL 768.27a" which "provides for the admission of evidence of other acts of sexual abuse committed against minors for ' "any matter to which it is relevant," ' including for propensity purposes." *Id*. at 467 n 6, quoting *Watkins*, 491 Mich at 469-471 and MCL 768.27a. The alternative basis for reversing the trial court in *Cowhy* was dictum because it was not necessary to the outcome in that case, which was rooted in analysis of MRE 410 and MRE 402. We observe that although we cited *Watkins* in *Cowhy* for allowing the admission of statutory other acts, we did not address how juvenile other acts squared with the *Watkins* factors. See *Cowhy*, 330 Mich App at 467 n 6.

uniformly reflected in our criminal and civil case law, statutes, and court rules, which assign different culpability to conduct committed by 7-year-olds, 14-year-olds, and 33-year-olds. See *Tyler*, 285 Mich at 469-470; MCL 712a.4; MCL 712a.16. But see *People v Cowhy*, 330 Mich App 452, 467 n 6; 948 NW2d 632 (2019) The probative value of this evidence is de minimis compared to the risk of unfair prejudice or confusion. First, it is unclear what if any probative value evidence of his sex acts at age 6 or 7, and 14 or 15 have for conduct when he is 33. The risks, however, are clear: a jury will hear this evidence and view Holtman as an irredeemable reprobate, someone who has been a sexual deviant his entire life. To emphasize this point, the prosecution even argues that these other acts are just the ones we know of, implying that we can reasonably conclude that there is more out there that Holtman has done. This is precisely the type of evidence that "is minimally damaging in logic" but "weighed by the jurors substantially out of proportion to its logically damaging effect . . . ." *People v McGuffey*, 251 Mich App 155, 163; 649 NW2d 801 (2002) (quotation marks and citation omitted). This aspect of the other-acts evidence was sufficient for us to find error, and one which compromises confidence in Holtman's conviction. But the enumerated *Watkins* factors also support exclusion of this evidence.

First, and relatedly, the dissimilarities between Holtman's other acts and the charged conduct are substantial. See *Watkins*, 491 Mich at 487. We acknowledge that ostensibly, this factor could be read as weighing in favor of admission, but only if we were to overgeneralize Holtman's conduct and the identity of the victims. For example, in *People v Solloway*, 316 Mich App 174, 194-195; 891 NW2d 255 (2016), this Court held that proposed other acts were not so dissimilar because: (1) the victim of the other acts sexual abuse and the victim of the charged conduct sexual abuse were both close in age at the time of the assault; (2) both victims were both related to the defendant; and (3) the defendant's conduct was similar in both cases of sexual abuse. Similarly, in the present case, (1) M and AD were both minors at the time of their abuse (M being between the ages of five to eight when Holtman sexually abused her, and AD being between the ages of two to nine); (2) M and AD are both "related" to Holtman (M being essentially his step-daughter and AD being his cousin); and M is related to Holtman as his stepdaughter, and AD is related as his cousin; and (3) at least one instance involved Holtman attempting to have oral sex. This, however, would require us to ignore the reality of the different relationship between cousins who are four years apart in age and a de facto stepfather and his stepdaughter that is 20 years younger than him. It would also require us to ignore the previously-stated differences in culpability and tactics between a 6- or 7-year-old and a 33-year-old. We would not conclude acts are similar in nature because the victims of two acts were female, without considering other aspects of the victim, defendant, and context of the crime. For the same reason, we cannot flatten the conduct as a sex crime against a relative without acknowledging the radically different relationship between cousins who are three years apart and a 33-year-old stepfather with his prepubescent step daughter. If we consider the context of the other acts evidence, rather than seeking to fit it into a framework that would automatically allow its admission, then we would have to conclude that aside from a common perpetrator, the other acts conduct and charged offenses could not be more different. This factor weighs against admission.

Regarding the temporal proximity of the other acts to the charged crime, see *Watkins*, 491 Mich at 487, the defense and prosecution agree that the other acts were not temporally proximate to the charged offense, the most recent occurring 15 to 18 years before the charged offenses and the earliest occurring 26 or 27 years before the charged offenses. This also weighs against

admission. See *People v Hoskins*, 342 Mich App 194, 206; 993 NW2d 48 (2022).[5] In *People v Hoskins*, this Court held that "evidence of prior acts committed 17 years before many of the charged offenses presents a risk that the jury may give undue weight to the other-acts evidence and overlook reasonable doubts stemming from a lack of evidence presented in support of the current charges." Here, the present charges were far removed from even the most recent other-acts evidence. Of course, this Court has allowed distal other-acts evidence, but only when the evidence bears substantial similarities to the charged offenses. See *Solloway*, 316 Mich App at 194-196. Here, no such substantial similarities exist. The other acts involved sex acts by Holtman against a 2-year-old cousin when he was 6 or 7 years old and against the same cousin when she was 10 or 11 and he was 14 or 15, while the charged offense involves a pattern of sex acts Holtman committed against his stepdaughter when she was 5 to 7 and he was 33. These significant differences prevent us from overlooking the substantial temporal gap.

Relatedly, the infrequency of the acts weighs against their admission. AD testified about three sex acts that occurred over the span of seven years, 15 to 18 years before the conduct in this case. The only acts that occurred close in time to each other were those committed during Holtman's criminal infancy, when Holtman was 6 or 7 years old. There was then a seven- or eight-year gap before the next act that AD testified occurred when Holtman was "roughly 14, maybe 15." Then 15 to 18 years passed before the charged conduct. One aspect of frequency is the number of acts. See *Solloway*, 316 Mich App at 195 (finding that the other acts were not infrequent because the abuse was not a "one-time occurrence"); see also *People v Beck*, 510 Mich 1, 21-22; 987 NW2d 1 (2022) (concluding that, because victim testified about three separate incidents, the other acts were not infrequent). But the other aspect is the proximity between multiple acts. See *Solloway*, 316 Mich App at 182, 194-196 (other-acts evidence involving defendant sexually touching his nephew "many times" over the span of several years when the nephew lived with him satisfied the frequency factor); *Beck*, 510 Mich at 8-10, 21-22 (holding that other-acts evidence, including three incidents of sexual contact against the defendant's daughter underpinning charges in a 2016 companion case, uncharged conduct against each of the defendant's other daughters when they were approximately 13 to 15 years old in 2007, 2011 to 2013, and 2014, were sufficiently proximate to each other and to the charges in the defendant's 2017 case). Here, although AD testified to more than one act, the incidents she described were seven years apart from each other and 15 to 18 years before the conduct in this case. This does not align with the frequency determination in other cases.

The absence of intervening acts also weighs against admission. See *Watkins*, 491 Mich at 487. Here, if believed, AD's testimony establishes that Holtman committed a sex act against his cousin at 15 and then against M between ages 30 and 33, 15 to 18 years later. The prosecution offered no evidence of other acts in between. At trial, Holtman presented reputational evidence of

---

[5] We reject Holtman's argument that AD's testimony that he assaulted her as a child had no probative value on the question of whether he abused M as an adult. We acknowledge that circumstances may exist where other-acts conduct is so similar or so temporally proximate that even juvenile conduct may be admissible. For example, a 19-year-old committing the same type of criminal sex act against the same or similar victim that he assaulted when he was 17 may satisfy the *Watkins* analysis.

him maintaining a positive relationship with his children and other children that he had before M disclosed the sexual abuse. In other words, Holtman was around other minors between age 15 and 30, but there was no evidence of misconduct in this intervening period. The conclusion that the prosecution asks us to draw is that there must be something else we do not know about. This is precisely the type of conclusion that the *Watkins* factors and MRE 403 are meant to guard against. This factor weighs against admission.

The two remaining *Watkins* factors cut both ways: (1) the need of evidence beyond the victim and the defendant's testimony; and (2) the reliability of the other-acts evidence. See *Watkins*, 491 Mich at 487-488. First, the need for evidence beyond M and Holtman's testimony is questionable. Here, M provided detailed testimony about the context, locations, and timing of the charged offenses. She also provided an understandable and credible sequence of reports: first an unprompted, contemporaneous report to her teachers and counselor, then her mother and investigators, then to a doctor. If the jury believed her testimony (and that of Dr. Simms regarding her anatomical descriptions) there would be enough to convict. See MCL 750.520h. In a sense, our Legislature has already stated that such corroborating evidence is unnecessary. See *id*. On the other hand, because she and Holtman were the only witnesses to the offenses, any other corroborating evidence or propensity evidence would make a difference. See *Solloway*, 316 Mich App at 196. Here, a jury could reasonably convict based on M's testimony and that of Dr. Simms. AD's testimony makes it hard not to convict. Because AD's testimony was unnecessary, but undoubtedly helpful to the prosecution, this factor seems to cut both ways.

Finally, the reliability of AD's testimony cuts both ways. See *Watkins*, 491 Mich at 487. Here, AD testified about memories she had of events that happened when she was two years old. The fact that AD was the only witness to some of these events is not dispositive. See *Beck*, 510 Mich at 22. Here, however, the issue is less that AD was the only witness and more so that she testified about events that occurred when she was a toddler. We acknowledge that parts of AD's testimony were detailed, suggesting reliability. We also acknowledge the possibility that an individual in their late 20s or early 30s may have clear memories of events that happened at age 2 or 3. But we must acknowledge that it is reasonable to question the reliability of those memories. Reasonable jurors could have wildly divergent views on the reliability of AD's testimony. This factor cuts both ways.

Considering that the trial court did not weigh the *Watkins* factors before admitting AD's testimony and that the *Watkins* factors either weigh against admission or cut both ways, the trial court's admission of this evidence was outside the range of principled outcomes. See *Feezel*, 486 Mich at 192.

Finally, this error was outcome determinative. We cannot say with confidence that the jury would have reached the same conclusion without AD's testimony. As stated, the prejudice associated with AD's testimony grossly outweighs its logical relevance. Instead of considering allegations of sex acts occurring across three years (the charged conduct), the jury considered evidence of Holtman's lifelong sexual deviance beginning at age 6 and continuing until age 33. Because this evidence undermines our confidence in the result, we must vacate the conviction and remand for a new trial.

IV. ADMISSION OF HEARSAY TESTIMONY

Although we conclude that the error related to other-acts evidence warrants reversal, it remains necessary to address Holtman's other evidentiary claim. Holtman next argues that the trial court erred by admitting hearsay testimony under MRE 803(4) because the statements were made for the purpose of criminal investigation rather than medical treatment and that the statements lacked indicia of reliability. We agree.

Hearsay is any statement that the declarant does not make while testifying and that a party offers "to prove the truth of the matter asserted in the statement." MRE 801. Generally, hearsay is inadmissible, see MRE 802, unless it falls under an exception pursuant to MRE 803 or MRE 804. MRE 803(4) provides that "[s]tatements made for purposes of medical treatment or medical diagnosis" are not excluded by the hearsay rule. Such statements are admissible pursuant to MRE 803(4) (1) "if they were reasonably necessary for diagnosis and treatment" and (2) "if the declarant had a self-interested motivation to be truthful in order to receive proper medical care." *People v Shaw*, 315 Mich App 668, 674; 892 NW2d 15 (2016) (quotation marks and citation omitted). "The rationale for MRE 803(4) is the existence of (1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient." *Id.* (quotation marks and citation omitted). Our Court has held that an apparent injury is not required. *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011). Particularly for medical treatment following sexual assault, latent injuries such as sexually transmitted infections or psychological impacts may not be physically manifested, so "a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment." *Id*.

Under the circumstance of this case, however, we agree with Holtman that MRE 803(4) does not apply for want of the first prong.[6] First, although M saw Dr. Simms two months after the

---

[6] At the threshold, we observe that M's statements to Dr. Simms had sufficient indicia of reliability. *People v Meeboer*, 439 Mich 310, 324-325; 484 NW2d 621 (1992). Regarding the second prong of MRE 804(3)—inherent trustworthiness—our Supreme Court has stated "further analysis of the circumstances surrounding the [medical] examination of a child is necessary to determine whether the child understood the need to be truthful to the physician." *Id*. The Court provided factors related to the trustworthiness, which included:

> (1) the age and maturity of the declarant, (2) the manner in which the statements are elicited (leading questions may undermine the trustworthiness of a statement), (3) the manner in which the statements are phrased (childlike terminology may be evidence of genuineness), (4) use of terminology unexpected of a child of similar age, (5) who initiated the examination (prosecutorial initiation may indicate that the examination was not intended for purposes of medical diagnosis and treatment), (6) the timing of the examination in relation to the assault (the child is still suffering pain and distress), (7) the timing of the examination in relation to the trial (involving the purpose of the examination), (8) the type of examination (statements made in the course of treatment for psychological disorders may not be as reliable), (9) the

initial disclosure of the assaults, the exam was three years and two months after the first sexual contact, diminishing the likelihood that M required *this* medical treatment. See *Shaw*, 315 Mich App at 675. Second, although M's mother made the appointment, neither M nor her mother sought out Dr. Simms for gynecological or emergency medical care. Rather, Dr. Simms was referred to M's mother by Safe Harbor, the entity responsible for conducting the forensic interview, which occurred prior to the medical treatment. See *id*. During the three years of sexual abuse, M presumably saw other physicians, who were not called as witnesses and do not appear to have been part of the investigation. This includes the unnamed primary care physician to whom Dr. Simms referred M for follow-up on the skin tag. The hearsay testimony was admitted in error. The effect was to allow the jury to hear another report of the sexual assault but with the gloss and authority of an expert witness. One who was effectively able to translate M's euphemistic descriptions of the sex act into anatomical terms that could satisfy the charge.

## V. CONCLUSION

For the reasons stated above, we vacate the conviction and remand for retrial. Because we resolve this appeal on the evidentiary errors, it is unnecessary for us to address the claimed error related to sentencing. We do not retain jurisdiction.

/s/ Noah P. Hood
/s/ Allie Greenleaf Maldonado

---

relation of the declarant to the person identified (evidence that the child did not mistake the identity), and (10) the existence of or lack of motive to fabricate. [*Id*.]

Applying the *Meeboer* factors to this case, the trial court did not err in concluding that M's statements to Dr. Simms had the hallmarks of trustworthiness based on her understanding of the need to be truthful in the context of the exam. See *Meeboer*, 439 at 324-325. See also *Mahone*, 294 Mich App at 214-215. At eight years old, M was old enough to appreciate the purpose of the examination. See *People v Duenaz*, 306 Mich App 85, 96; 854 NW2d 531 (2014). Dr. Simms described her as engaged and talkative. M described the sexual assault in response to nonleading questions (i.e., "why she was here today for a check-up" and "if she had anything else to tell me before the check-up"). See *Meeboer*, 439 Mich at 324-325. And she used age-appropriate language including child-like euphemisms for genitalia. *Id*. at 325. Although certain factors might suggest unreliability, namely, that the appointment was a referral from Safe Harbor (the entity responsible for the forensic interview) and time lapse between the sexual conduct and the exam, consideration of the total circumstances indicates there were sufficient indicators of reliability. This aspect of MRE 803(4) is not a problem.

-11-